1

2

3

4

5

6

7

8
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
9
AT TACOMA

10
JOSEPH W. GRANVILLE,

11
Plaintiff,

12
v.

13
MICHAEL J. ASTRUE, Commissioner
of the Social Security Administration,
14

15
Defendant.

CASE NO. 10cv5797-RBL-JRC

REPORT AND
RECOMMENDATION ON
PLAINTIFF'S COMPLAINT

NOTED FOR: January 27, 2012

16

17
        This matter has been referred to United States Magistrate Judge J. Richard

18
Creatura pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Judge Rule MJR

19
4(a)(4), and as authorized by <u>Mathews, Secretary of H.E.W. v. Weber</u>, 423 U.S. 261,

20
271-72 (1976).  This matter has been fully briefed. (<u>See</u> ECF Nos. 15, 19, 22).

21
        Based on the relevant record, the Court finds that the ALJ did not fail in his duty

22
to develop the record. He also properly evaluated the medical evidence and plaintiff's

23
credibility when only the evidence that was before the ALJ is considered. However, the

24

new evidence submitted by plaintiff is material, significant and probative. Without explicit consideration of the new evidence, the ALJ's written decision is not based on substantial evidence in the record as a whole. Therefore, this matter should be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings.

<u>BACKGROUND</u>

Plaintiff, JOSEPH W. GRANVILLE, was born in 1985 and was twenty-two years old on his alleged disability onset date of December 1, 2007 (<u>see</u> Tr. 123). He started college in the fall of 2003 (Tr. 37). He testified that "around 2006 and 2007" he began reducing his course load (<u>id.</u>). He had an on-campus job, which he had managed to continue part time (<u>id.</u>). As of his March 26, 2010 hearing date, he was working between ten and fifteen hours a week (<u>id.</u>). Although he was scheduled for more hours, he testified that his "condition has kept me from getting in on time for several months now" (<u>id.</u>). For his job, he did mostly office work and technical support for campus computers (<u>id.</u>). He testified that his employer was accommodative regarding his narcolepsy condition, which is the condition that he testified kept him "out of work on a day to day basis" (Tr. 37-38). He indicated that he cannot get into work on time on a consistent basis, due to his disturbed sleep (Tr. 38).

<u>PROCEDURAL HISTORY</u>

In April, 2008, plaintiff protectively filed an application for Supplemental Security Income ("SSI") benefits, alleging disability since December 1, 2007 (Tr. 123-29). His subsequently filed application for Social Security disability benefits was

combined with his SSI claim, both of which were denied initially and following reconsideration (Tr. 66-77). His requested hearing was held via video conference on March 26, 2010 before Administrative Law Judge Greg G. Kenyon ("the ALJ") (Tr. 30-65). On April 21, 2010, the ALJ issued a written decision in which he found that plaintiff had not been disabled pursuant to the Social Security Act (Tr. 11-23).

On August 25, 2010, the Appeals Council denied plaintiff's request for review, making the written decision by the ALJ the final agency decision subject to judicial review (Tr. 1-6). See 20 C.F.R. § 404.981. On October 28, 2010, plaintiff attached a complaint to his motion for leave to proceed *in forma pauperis*, requesting judicial review of the ALJ's written decision (see ECF Nos. 1, 3). On February 25, 2011, defendant filed the sealed administrative record regarding this matter (see ECF No. 9). In his Opening Brief, plaintiff alleges the following errors by the ALJ: (1) failure to develop the record properly; (2) failure to evaluate properly the medical evidence; (3) failure to evaluate properly plaintiff's credibility; (4) failure to determine properly plaintiff's residual functional capacity; and, (5) failure to demonstrate that plaintiff could perform any work in the national economy (see ECF No. 15). Plaintiff also contends that the Appeals Council erred by failing to remand this matter for a new hearing based on new evidence (see id., pp. 22-23).

STANDARD OF REVIEW

Plaintiff bears the burden of proving disability within the meaning of the Social Security Act (hereinafter "the Act"). Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999); see also Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). The Act defines

disability as the "inability to engage in any substantial gainful activity" due to a physical or mental impairment "which can be expected to result in death or which has lasted, or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Plaintiff is disabled under the Act only if plaintiff's impairments are of such severity that plaintiff is unable to do previous work, and cannot, considering the plaintiff's age, education, and work experience, engage in any other substantial gainful activity existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of social security benefits if the ALJ's findings are based on legal error or not supported by substantial evidence in the record as a whole. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (citing Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1999)). "Substantial evidence" is more than a scintilla, less than a preponderance, and is such "'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989) (quoting Davis v. Heckler, 868 F.2d 323, 325-26 (9th Cir. 1989)); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). In addition, the Court "'must independently determine whether the Commissioner's decision is (1) free of legal error and (2) is supported by substantial evidence.'" See Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2006) (citing Moore v. Comm'r of the Soc. Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002)); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

According to the Ninth Circuit, "[l]ong-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and actual findings offered by the ALJ - - not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking." Bray v. Comm'r of SSA, 554 F.3d 1219, 1226-27 (9th Cir. 2009) (*citing* SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) (other citation omitted)); see also Stout v. Commissioner of Soc. Sec., 454 F.3d 1050, 1054 (9th Cir. 2006) ("we cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision") (citations omitted). For example, "the ALJ, not the district court, is required to provide specific reasons for rejecting lay testimony." Stout, supra, 454 F.3d at 1054 (*citing* Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993)). In the context of social security appeals, legal errors committed by the ALJ may be considered harmless where the error is irrelevant to the ultimate disability conclusion. Stout, supra, 454 F.3d at 1054-55 (reviewing legal errors found to be harmless).

<u>DISCUSSION</u>

1.  The ALJ did not fail in his duty to develop the record.

The ALJ "has an independent 'duty to fully and fairly develop the record.'" Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001) (*quoting* Smolen, supra, 80 F.3d at 1288). The ALJ's "duty exists even when the claimant is represented by counsel." Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983) (per curiam) (*citing* Driggins v. Harris, 657 F.2d 187, 188 (8th Cir. 1981)). This duty is "especially important when plaintiff suffers from a mental impairment." Delorme v. Sullivan, 924 F.3d 841, 849 (9th Cir. 1991)). This is "[b]ecause mentally ill persons may not be

capable of protecting themselves from possible loss of benefits by furnishing necessary evidence concerning onset." Id. (*quoting* Social Security Regulation 83-20). However, the ALJ's duty to supplement the record is triggered only if there is ambiguous evidence or if the record is inadequate to allow for proper evaluation of the evidence. Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001); Tonapetyan, supra, 242 F.3d at 1150. In addition, it is plaintiff's duty to prove that he is disabled. See 42 U.S.C. § 423(d)(5) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require"). According to a relevant federal regulation, "you have to prove to us that you are blind or disabled. Therefore, you must bring to our attention everything that shows that you are blind or disabled." 20 C.F.R. § 404.1512(a); see also Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001).

The courts also recognize, however, that evidence not submitted during the hearing may be considered in the determination of whether or not the ALJ's decision was supported by substantial evidence, see infra, section 5. See Ramirez v. Shalala, 8 F.3d 1449, 1454 (9th Cir. 1993); Taylor v. Comm'r Soc. Sec. Admin, 659 F.3d 1228, 1232 (9th Cir. 2011). Therefore, it is important to consider what was included in the record that the ALJ reviewed and what was not in the record submitted to the ALJ. If the record, by itself, triggers the ALJ's duty to investigate, then this will be considered before consideration of any evidence that was not part of the record.

a.  <u>Evidence included as part of the record before the ALJ</u>.

Dr. Maureen A. Callaghan, M.D. ("Dr. Callaghan") examined and evaluated plaintiff on December 17, 2007 (Tr. 198-202). Dr. Callaghan provided a neurological consultation regarding plaintiff's various pains, headaches and narcolepsy (Tr. 199). She noted that plaintiff could go longer than a month without a headache and that a "change in diet and exercise has been of some benefit" (id.). Dr. Callaghan also noted plaintiff's headache triggers and his subjective report that he was "better with sleep and consuming fluids" (id.).

Dr. Callaghan performed a physical examination, and for her mental status examination, assessed that plaintiff was "within normal limits to conversation" (Tr. 201). Dr. Callaghan also performed a neurological examination, and assessed many areas of normal functioning, although she also noted diffusely hypoactive deep tendon reflexes (id.). Dr. Callaghan noted that plaintiff's problems with depression were reported as "currently quiescent" and opined that he had a "normal neurological examination" (Tr. 202). Her plan was for plaintiff to continue with Provigil, and for plaintiff to have laboratory tests regarding his muscle pains (id.).

Dr. Seth J. Stankus, D.O. ("Dr. Stankus") examined and evaluated plaintiff on November 4, 2008 (Tr. 229-34). Dr. Stankus noted plaintiff's subjective report that he started taking Provigil after his diagnosis of narcolepsy and noted plaintiff's statement that "he has had a rather striking improvement on the Provigil" (Tr. 231). Dr. Stankus also noted plaintiff's subjective report that the Provigil "will completely eliminate the excessive daytime drowsiness and falling asleep during inappropriate times" (id.). Dr.

Stankus also indicated plaintiff's self-report that "he does not do well if he does not follow a regular" eating and sleeping schedule (id.). Dr. Stankus performed a physical examination, including a neurological examination (Tr. 232). Dr. Stankus assessed many normal findings and indicated that plaintiff's deep tendon reflexes were 2/4 (id.). Dr. Stankus opined that although plaintiff's history was consistent with idiopathic hypersomnia, Dr. Stankus was "not sure if this represents true narcolepsy" (id.). Dr. Stankus indicated his plan for plaintiff to continue on Provigil and return for further evaluation in six months (id.).

Dr. Brian Andrew Dickens, M.D. ("Dr. Dickens") evaluated plaintiff on December 9, 2008 (Tr. 235-37). Dr. Dickens noted that plaintiff indicated that Provigil was "too expensive" (Tr. 235). He diagnosed plaintiff with narcolepsy and indicated the plan to "discuss with social work to see what programs may be available" to plaintiff for help getting Provigil (id.). Dr. Dickens also diagnosed "major depression single episode, in partial remission" (Tr. 236). He indicated a plan to refer plaintiff for further mental health evaluation and treatment (id.). Dr. Dickens also indicated that plaintiff was "advised to stop smoking marijuana as this may cause deleterious effects on his asthma, narcolepsy, and is also illegal" (id.).

Dr. Jon C. Kooiker, M.D. ("Dr. Kooiker"), of Olympia Neurology, examined and evaluated plaintiff on November 9, 2009 (see Tr. 217-20). He noted plaintiff's past medical record, including narcolepsy, and some of plaintiff's subjective statements, such as complaints of headaches (Tr. 217-19.). He performed a neurological examination and diagnosed plaintiff with "narcolepsy; migratory headaches with episodic stabbing pains

felt to represent a benign primary headache disorder; and, history of muscle and joint pain of uncertain etiology" (id.). He advised particular tests to inquire further as to the cause of plaintiff's muscle complaints, and opined that the test results likely "will be normal" (Tr. 220). At the subsequent evaluation of plaintiff by Dr. Kooiker, the report indicates that the laboratory studies "showed no evidence of a Rheumatological or inflammatory disorder" (Tr. 221).

On March 3, 2010, Dr. Kooiker noted that Provigil was helping partially, but also noted the side effect of headaches (see Tr. 221). He assessed that no "neurologic disorder is identified other than possibly narcolepsy documented by a sleep laboratory" (id.). He indicated in his plan and treatment recommendation that he did "not identify or recognize a neurologic disorder at this time" (id.).

On March 26, 2010, plaintiff testified that he was currently taking Provigil, although it gave him headaches (Tr. 39-40). He indicated that it allowed him to get into work, although it then was uncomfortable (Tr. 39). Plaintiff testified that following taking Provigil, he got "a very intense headache about 30-45 minutes after taking it that lasts a couple of hours" (id.). He testified that up until the previous summer, he had been able to work eight to five, Monday through Thursday (Tr. 40). However, he testified that recently he had not been able to go into work consistently before ten (id.).

Plaintiff testified that he used marijuana to help with gastrointestinal symptoms and with his headaches (Tr. 41-42). He testified that he is sleepy during the day and that on his worst days he tries to "find something kind of repetitive and mindless that I can sit there and do until I wake up or the day ends" (Tr. 43). He explained further that he

"definitely can get a little bit lost like in between steps and things or remembering what someone asks me to do" (id.). Regarding completing tasks, plaintiff testified that he was able to complete small tasks, but that the "big piles of things take a long time" (id.). He testified that he wears wrist braces, but that he is able to work on the computer for the most part, as he knows "all the keyboard shortcuts" (Tr. 45).

The medical expert, Dr. John Anagbogu, M.D., who testified at plaintiff's hearing, indicated his assessment that plaintiff was capable of light work, although plaintiff had environmental limitations, should work in a low stress environment and should not be expected to climb heights or operate machinery (Tr. 55).

b. Evidence submitted before plaintiff's hearing but not part of the record included in the ALJ's Exhibit List (Exhibits 9F and 10F).

Plaintiff's May 3, 2006 cervical spine X-ray revealed curvature reversal and "very early degenerative disc disease C4-5 and C5-6" (Tr. 254). The X-ray demonstrated an otherwise "normal exam" (id.). Plaintiff's September 20, 2006 lumbar spine X-ray revealed "incidental incomplete fusion of posterior elements of S1 [and] Questionable minimal disc space narrowing at L5-S1" (Tr. 255). On November 29, 2007, Dr. J.W. Black, M.D. ("Dr. Black") assessed that plaintiff's sleep latency testing results indicated "3 sleep onset REM episodes consistent with narcolepsy or other causes of severe excessive daytime sleepiness" (Tr. 256).

Although plaintiff would have the Court consider additional evidence as part of the Court's assessment regarding the ALJ's duty to develop the record, the records referred to as Exhibit 11F-14F do not appear to have been before the ALJ by the time his

decision was written and issued (see Tr. 24-26; see also Tr. 254-95). Although plaintiff's letter to the Appeals Council suggests that some of this evidence was submitted electronically after the end of the second business day prior to the date that the ALJ's written decision was entered, plaintiff admits in this letter that "the ALJ may not have seen this evidence" and that it was not included on the Exhibit List attached to the ALJ's decision (Tr. 186). Because this evidence may not have been viewed by the ALJ before the written decision was issued, the Court will not consider this evidence when determining whether or not there was any ambiguity in the record sufficient to trigger the ALJ's duty to develop the record. This new evidence will be considered, however, in the determination of whether or not the ALJ's decision was supported by substantial evidence, see infra, section 5. See Ramirez v. Shalala, 8 F.3d 1449, 1454 (9th Cir. 1993); Taylor v. Comm'r Soc. Sec. Admin, 659 F.3d 1228, 1232 (9th Cir. 2011). Although Exhibits 9F and 10F were not part of the ALJ's Exhibit List, they appear to have been submitted before plaintiff's hearing (see Reply, ECF No. 22, p. 5). This evidence has been reviewed by the Court as part of the record and is considered in the context of the ALJ's duty to develop the record.

Plaintiff supports his contention that the ALJ failed to develop the record by citing treatment notes from Dr. Rebecca Jo Renn, M.D. ("Dr. Renn"), who provided opinions regarding plaintiff's mental limitations (see Opening Brief, ECF No. 15, pp. 15-16). However, as noted previously, this evidence was not on the ALJ's Exhibit List and does not appear to have been before the ALJ when the written decision was submitted for entry (see Tr. 9, 24-26; see also Tr. 290-95). As indicated in the letter from

plaintiff's attorney to the Appeals Council, "the ALJ may not have seen this evidence" (Tr. 9). Plaintiff has not cited any federal regulation or case law suggesting that the Court's decision regarding an ALJ's duty to develop the record must be informed by evidence that was not before the ALJ.

Plaintiff also complains about the ALJ's failure to grant his request for further assessment of his mental impairments by consultative examination due to plaintiff's alleged somatoform disorder. In his written decision, the ALJ noted "no evidence of a separate area of psychopathology which would warrant a psychological consultative examination due to a proposed diagnosis of somatoform disorder" (Tr. 17). The ALJ supported this assessment by finding that no "treating or examining mental health professional has suggested this diagnosis" (id.). Plaintiff has not directed this Court to any evidence available to the ALJ that calls into question this assessment. The Court has reviewed medical evidence from various medical professionals, including multiple neurological specialists, and it does not appear that any of the doctors suggested that plaintiff suffered from a somatoform disorder. For this reason and based on the relevant record, the Court concludes that the ALJ's findings regarding plaintiff's alleged somatoform disorder are supported by substantial evidence in the record and do not suggest that the ALJ failed in his duty to develop the record.

The ALJ noted that Dr. Kooiker had "conducted neurological examinations that revealed no clear neurological disorders" (Tr. 18; *see also* Tr. 221). Regarding plaintiff's narcolepsy, his daytime sleepiness, and similar symptoms, the ALJ also noted plaintiff's self-report that "he obtained relief with Provigil" (Tr. 20; <u>see also</u> Tr. 231). The Court

noted previously that plaintiff reported "striking improvement" with Provigil and that Dr. Stankus noted plaintiff's subjective report that the Provigil "will completely eliminate the excessive daytime drowsiness and falling asleep during inappropriate times" (Tr. 231).

The ALJ noted plaintiff's college classes, specifically pointing out that a professor at plaintiff's school liked him and hired him part-time as a teacher's aide (Tr. 19). The ALJ also noted plaintiff's report that a regular schedule of sleeping and eating, as well as drinking fluids helped plaintiff's symptoms (Tr. 20). In his written decision, the ALJ indicated that plaintiff expressed his intention to continue using marijuana as a self-prescribed medicinal preparation, despite being advised that it may have deleterious effects on his asthma and narcolepsy (Tr. 21; see also Tr. 236). The ALJ also noted plaintiff's self-report that the headaches only occurred once or twice a month (id.; see also Tr. 217).

Regarding plaintiff's depression, the Court already has noted Dr. Callaghan's indication that plaintiff reported that his depression was "currently quiescent" on December 17, 2007 (Tr. 202). In addition, Dr. Dickens on December 9, 2008 indicated that plaintiff's depression was in partial remission (Tr. 236). Based on a review of the relevant record, it does not appear that any of plaintiff's treating or examining doctors observed depressed or otherwise unusual affect when evaluating plaintiff. Dr. Callaghan explicitly noted in her mental status examination that plaintiff's results were "within normal limits to conversation" (Tr. 201). The ALJ noted that plaintiff's depression currently was being treated with psychotherapy (Tr. 21). The ALJ considered plaintiff's

depression and indicated that as a result, he was limiting plaintiff's residual functional capacity to that of simple, repetitive tasks (id.).

The ALJ discussed various treatment notes and determined that plaintiff had the residual functional capacity to perform light work with limitations to performing unskilled, simple, repetitive tasks, and low stress jobs which are defined as jobs involving only occasional adaptations to changes in the workplace or to the specific work processes performed (Tr. 19). The ALJ also limited plaintiff's residual functional capacity in that he could not climb ladders, ropes, or scaffolds; could not work around hazards such as unprotected heights or dangerous moving machinery; could not perform commercial driving or work in environments with concentrated exposure to pulmonary irritants; and, could only occasionally use his hands for fine bilateral manipulation (id.). The ALJ's determination regarding plaintiff's residual functional capacity is in line with the testimony by the medical expert, Dr. John Anagbogu, M.D., who opined that plaintiff was capable of light work, although plaintiff had environmental limitations, should work in a low stress environment and should not be able to climb heights or operate machinery (see Tr. 55). Due to plaintiff's allegations of headaches, the ALJ assessed limitations to plaintiff's concentration, such as hazard, driving and height restrictions (Tr. 21).

As already stated, plaintiff bears the responsibility for providing evidence demonstrating disability. 20 C.F.R. § 404.1512(a); see also Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001). However, if the record is ambiguous, the duty to develop the record is triggered. See Tonapetyan, supra, 242 F.3d at 1150; Mayes, supra, 276 F.3d

at 459-60. Based on a review of the relevant record, the Court does not find any ambiguity regarding plaintiff's mental functional limitations sufficient to trigger the ALJ's duty to develop the record. See Tonapetyan, supra, 242 F.3d at 1150; Mayes, supra, 276 F.3d at 459-60. From a review of the relevant record, as discussed by the Court above, the record was adequate to allow for proper evaluation of the evidence.

    2.  <u>The ALJ evaluated properly the medical evidence before him.</u>

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998); <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1043 (9th Cir. 1995). It is not the job of the court to reweigh the evidence: If the evidence "is susceptible to more than one rational interpretation," including one that supports the decision of the Commissioner, the Commissioner's conclusion "must be upheld." <u>Thomas v. Barnhart</u>, 278 F.3d 947, 954 (9th Cir. 2002) (*citing* <u>Morgan v. Comm'r of Soc. Sec. Admin.</u>, 169 F.3d 595, 599, 601 (9th Cir. 1999)). The ALJ also may draw inferences "logically flowing from the evidence." <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1999) (citations omitted). According to Social Security Ruling ("SSR") 96-8p, if a residual functional capacity "assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 SSR LEXIS 5 at *20.

Although plaintiff argues that the ALJ failed to evaluate properly the medical evidence, plaintiff does not specify any opinion by a medical source in the record before the ALJ that was rejected by the ALJ (<u>see</u> Opening Brief, ECF No. 15, p. 17). The ALJ's

determination regarding plaintiff's severe impairments and residual functional capacity indicates clearly that plaintiff's treating physicians' and examining physicians' opinions were credited (see Tr. 17, 19). Although plaintiff mentions an assessment by Dr. Black that plaintiff's sleep latency testing results indicated "3 sleep onset REM episodes consistent with narcolepsy or other causes of severe excessive daytime sleepiness," this is not a finding that was discredited by the ALJ (see Reply, ECF No. 22, p. 5; see also Tr. 256). Dr. Black did not opine that plaintiff suffered from daytime sleepiness that was so severe that it precluded all work activity (see Tr. 256). The ALJ noted plaintiff's diagnosis of narcolepsy and indicated that he considered it to be one of plaintiff's severe impairments (see Tr. 17, 18). The Court notes that the ALJ also referenced plaintiff's treatment record in which plaintiff indicated that he "had a rather striking improvement on the Provigil" and indicated that Provigil "will completely eliminate the excessive daytime drowsiness and falling asleep during inappropriate times" (see Tr. 18, 21; Tr. 231). For these reasons and based on the relevant record, the Court concludes that the ALJ properly evaluated the medical evidence before him.

      3.   <u>The ALJ evaluated properly plaintiff's credibility</u>.

      If the medical evidence in the record is not conclusive, sole responsibility for resolving conflicting testimony and questions of credibility lies with the ALJ. <u>Sample</u>, <u>supra</u>, 694 F.2d at 642; <u>Waters v. Gardner</u>, 452 F.2d 855, 858 n.7 (9th Cir. 1971); (<u>Calhoun v. Bailar</u>, 626 F.2d 145, 150 (9th Cir. 1980). An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment. <u>Fair v.</u>

_Bowen_, 885 F.2d 597, 603 (9th Cir. 1989) (_citing_ 42 U.S.C. § 423(d)(5)(A)). Even if a

claimant "has an ailment reasonably expected to produce _some_ pain; many medical

conditions produce pain not severe enough to preclude gainful employment." Fair,

supra, 885 F.2d at 603.

Nevertheless, the ALJ's credibility determinations "must be supported by

specific, cogent reasons."  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citation

omitted). In evaluating a claimant's credibility, the ALJ cannot rely on general findings,

but "'must specifically identify what testimony is credible and what evidence

undermines the claimant's complaints.'"  Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir.

2006) (_quoting_ Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.

1999)); Reddick, supra, 157 F.3d at 722 (citations omitted); Smolen, supra, 80 F.3d at

1284 (citations omitted). The ALJ may consider "ordinary techniques of credibility

evaluation," including the claimant's reputation for truthfulness and inconsistencies in

testimony, and may also consider a claimant's daily activities, and "unexplained or

inadequately explained failure to seek treatment or to follow a prescribed course of

treatment." Smolen, supra, 80 F.3d at 1284.

The determination of whether or not to accept a claimant's testimony regarding

subjective symptoms requires a two-step analysis.  20 C.F.R. §§ 404.1529, 416.929;

Smolen, 80 F.3d at 1281 (_citing_ Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).  First,

the ALJ must determine whether or not there is a medically determinable impairment

that reasonably could be expected to cause the claimant's symptoms. 20 C.F.R. §§

404.1529(b), 416.929(b); Smolen, supra, 80 F.3d at 1281-82.  Once a claimant produces

medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." Bunnell v. Sullivan, 947 F.2d 341, 343, 346-47 (9th Cir. 1991) (*en banc*) (*citing* Cotton, supra, 799 F.2d at 1407). Absent affirmative evidence that the claimant is malingering, the ALJ must provide specific "clear and convincing" reasons for rejecting the claimant's testimony. Smolen, supra, 80 F.3d at 1283-84; Reddick, supra, 157 F.3d at 722 (*citing* Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996); Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

The ALJ gave multiple reasons for his determination that plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with" the ALJ's determination regarding plaintiff's residual functional capacity ("RFC") (see Tr. 20-21). The Court first notes that the ALJ did not list all of plaintiff's alleged symptoms that reasonably could be expected to have been caused by his medically determinable impairments, such as his impaired concentration, difficulty maintaining a normal work schedule, nausea and headaches (see Tr. 20). However, the ALJ indicated that he considered all of plaintiff's alleged symptoms (Tr. 19) and this indication is supported by substantial evidence in the record (see, e.g., Tr. 21). For example, the ALJ indicated that he imposed limitations on plaintiff's RFC on the basis of plaintiff's daytime sleepiness, intermittent headache pain, wrist pain, mild depressive symptoms and limited concentration (Tr. 21). Furthermore, the ALJ assessed plaintiff's "limited reliability and productivity" with respect to his efforts in the workplace and the special dispensation he received from his employer, and

conceded that plaintiff's work environment qualified as a "sheltered work environment" (Tr. 16). In addition, the ALJ noted that plaintiff's alleged lack of concentration, getting lost in performing tasks and difficulties getting to work in the mornings were contradicted by plaintiff's enrollment in school and that plaintiff interacted "well with professors to the extent that he was offered a part-time job as a teacher's aide" (Tr. 20). Therefore, the Court finds that the ALJ considered appropriately all of plaintiff's symptoms that reasonably were caused by his medically determinable impairments.

When making his credibility determination, the ALJ noted multiple negative findings from Dr. Callaghan and indicated that plaintiff admitted that "keeping a regular schedule and eating on a schedule and drinking plenty of fluids both served to keep his symptoms to a minimum" (Tr. 20 (*citing* Exhibit 2F)). Plaintiff complains that the ALJ's summary was not accurate (see Opening Brief, ECF No. 15, p. 18). Dr. Callaghan's treatment note indicates plaintiff's self-report that "he is better with sleep and consuming fluids" (Tr. 199). The Court also notes the treatment note of Dr. Stankus, which includes plaintiff's self-report that "he does not do well if he does not follow a regular schedule. He notes increased difficulty with his narcolepsy symptoms if he is sleep deprived or even if he gets out of a normal regular eating routine" (Tr. 231).

The ALJ may draw inferences "logically flowing from the evidence." See Sample, supra, 694 F.2d at 642. The treatment note of Dr. Stankus leads to the logical inference that plaintiff's symptoms are reduced if he follows a normal eating and sleeping schedule (see Tr. 231). Although plaintiff did not indicate that these factors, along with fluid intake, kept his symptoms to a minimum, the finding that these actions

by plaintiff reduced his symptoms nevertheless is supported by substantial evidence in the record.

In the context of the ALJ's determination regarding plaintiff's credibility, the ALJ also noted plaintiff's report that he received relief from his symptoms with Provigil and his indication in the record that his headaches only occurred not more frequently than at the rate of 1 or 2 a month (Tr. 21, 217 (plaintiff's "headaches occur one to (sic) times per month"), 231). The ALJ also noted that various alleged impairments by plaintiff have little or no support in the record and were not associated with any prescribed treatment or medications (see Tr. 21). The ALJ referenced plaintiff's treatment of psychotherapy for his depression (id.).

In support of his credibility determination, the ALJ referenced the treatment note wherein plaintiff was advised to stop smoking marijuana (Tr. 21). As referenced previously, plaintiff was "advised to stop smoking marijuana as this may cause deleterious effects on his asthma, narcolepsy, and is also illegal" (Tr. 236). The ALJ noted that plaintiff "expressed his intention to continue using this substance as a self-prescribed medicinal preparation" (Tr. 21).

Although the ALJ indicated that he gave the state agency medical consultant's opinions "considerable weight," the ALJ nevertheless further limited plaintiff's RFC on the basis of plaintiff's alleged symptoms (Tr. 21). Therefore, the ALJ did credit plaintiff's credibility, in part (see id.).

However, the ALJ found that plaintiff's credibility was compromised by plaintiff's continued drug use and a statement from a May, 2008 treatment note

"regarding his plan to use the disability process to extend his eligibility for benefits while looking for employment" (Tr. 21). Plaintiff complains that this is not an accurate reflection of the record (see Opening Brief, ECF No. 15, p. 19). The May 8, 2008 treatment note indicates that plaintiff stated that he was "'applying for Social Security disability so that my eligibility to TRICARE benefits is extended for the duration of disability'" (Tr. 206). According to this treatment note, plaintiff further stated that this "will continue till I get a job which provides me with health insurance" (id.). Although the ALJ did not indicate with precision what plaintiff stated at his appointment, the ALJ indicated that plaintiff's statements were not "consistent with the existence of disabling limitations" (Tr. 21). Based on the relevant record, the Court concludes that this finding by the ALJ is supported by substantial evidence in the record and provides support for the ALJ's credibility determination.

The ALJ also found that plaintiff's "symptom severity is also very much under his own control, with regular sleeping, eating, and drinking patterns being very efficacious for control" (Tr. 21). Although it is not clear to what degree plaintiff's symptoms improve with these measures, the fact that plaintiff's symptoms are partially under his own control is a finding with substantial support in the record and provides more support for the ALJ's credibility determination (see Tr. 199, 231).

The ALJ also found that plaintiff's ability "to persist with work as a teacher's aide 5 to 6 hours a day in a computer lab" was not consistent with the existence of disabling limitations (Tr. 21). The ALJ further indicated that plaintiff's work "with

computers indicates that his wrist pain is not as intense as alleged" (id.). These findings provide some support for the ALJ's credibility determination.

Finally, the ALJ noted that plaintiff reported not using Provigil because it was too expensive (id.). The ALJ found that if plaintiff's symptoms "were so limiting, the claimant would exploit every option to obtain the Provigil before settling for life without it" (id.). Although disability benefits may not be denied because of a claimant's failure to obtain treatment that he cannot afford, see Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995), the record includes a plan by Dr. Dickens to "discuss with social work to see what programs may be available" to plaintiff for help getting Provigil (Tr. 235). It is not clear from the record whether or not plaintiff followed up on Dr. Dickens' plan to seek resources to aide him in receiving Provigil. The Court finds that this factor provides little, if any, support for the ALJ's credibility determination.

The ALJ made minor errors in the evaluation of plaintiff's credibility, as noted. The Court also has noted that the ALJ credited plaintiff's allegations in part, but did not credit fully his allegations regarding his symptoms. Based on a review of the relevant record overall, the Court finds that the ALJ provided clear and convincing reasons to discredit in part, plaintiff's credibility. See Smolen, supra, 80 F.3d at 1283-84; Reddick, supra, 157 F.3d at 722.

4. The ALJ evaluated properly plaintiff's residual functional capacity based on the evidence before him.

Plaintiff complains that the ALJ did not consider properly plaintiff's testimony when assessing plaintiff's RFC. However, the Court has concluded that the ALJ

properly did not credit fully plaintiff's credibility and allegations, see supra, section 3.

Plaintiff also complains that the ALJ's RFC assessment is not proper as it is not based

on a proper review of the medical evidence and because it failed to account for

limitations assessed by Dr. Renn (see Opening Brief, ECF No. 15, p. 21). The Court

already has determined that the ALJ evaluated properly the medical evidence before

him, see supra, section 2. The question of whether or not the ALJ's decision is supported

by substantial evidence when the new evidence is considered will be considered by the

Court in the context of the review of the new evidence, see infra, section 5.

5.  This matter should be remanded for a new hearing based on new evidence.

Plaintiff contends that with the new evidence from Dr. Renn and Ms. Emily

Mould, MLT, mental health counselor (see Exhibits 11F-14F), that "the ALJ does not

still need to obtain a consultative psychological evaluation" (Reply, ECF No. 22, p. 5).

Defendant concedes that the Court may consider new evidence when making the

determination as to whether or not the ALJ's decision is supported by substantial

evidence (see Defendant's Brief, ECF No. 19, p. 5). See also Ramirez, supra, 8 F.3d at

1452. In this matter, the Appeals Council considered the new evidence, but found that it

did "not provide a basis for changing the Administrative Law Judge's decision" (Tr. 2;

see also Tr. 4-6). For these reasons, the Court shall consider the new evidence, discussed

below, when determining whether or not the ALJ's written decision is supported by

substantial evidence in the record as a whole.

a.  Evidence from other non-medical sources.

1.  Ms. Susie Seip

Ms. Susie Seip ("Ms. Seip") wrote a letter providing a lay opinion on April 16, 2020 (Tr. 273). In her letter, she referenced the basis for her relationship with plaintiff in that she supervised plaintiff's work (id.). She also indicated that she observed plaintiff experiencing health problems that "diminished his ability to perform many of the activities in which most students participate and which also impacted his ability to work" (id.). She indicated that she allowed him to leave work on occasion, when plaintiff was unable to perform his job duties due to illnesses (id.).

  2. Mr. Gary Ohlinger

Mr. Gary Ohlinger ("Mr. Ohlinger"), student supervisor, wrote a letter to plaintiff on April 19, 2010 (Tr. 274). He referenced plaintiff's "absences and tardiness over the past few months" (id.). The letter indicated that plaintiff's work was aware that there had been "an excess absences and tardiness because of your health issues" (id.). The letter further indicated that continued "tardiness or missing work without calling in will result in serious consequences for your continued employment with Technical Support Services" (id.).

  b. <u>Evidence from other medical source, Ms. Mould</u>.

Between the two examinations by Dr. Kooiker, on December 14, 2009, Ms. Emily Mould, MLT, mental health counselor, explicitly performed a mental status examination (Tr. 269-70). She noted that plaintiff self-reported feeling stressed, overwhelmed, anxious and depressed (Tr. 270). She also indicated her objective assessment that his affect was "congruent with content of discussion and his self-reported feelings" (Tr. 270). Ms. Mould also noted "no unusual affective response" (id.).

She opined that intellectual "functioning and memory did not appear to be impaired, and he appears to be of average to above average intelligence" (id.). She indicated her assessment that he suffered from major depressive disorder, recurrent episode; generalized anxiety disorder; and, marijuana abuse, among other things (id.). She rated his Global Assessment of Functioning ("GAF") at 55-60 (id.). She indicated her plan for plaintiff to have therapy and learn skills to manage stress (Tr. 270-71). She indicated that if "more intensive continuing services are desired, the patient may see an RN associated with Group Health" (Tr. 271).

      c. <u>Evidence from acceptable medical source, Dr. Renn</u>

Dr. Renn, psychiatrist, provided a medical source statement regarding plaintiff's limitations on April 13, 2010 (<u>see</u> Tr. 290-95). She opined specifically that plaintiff suffered from moderate limitations in his ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; and, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. 291).

Although the ALJ evaluated properly the medical evidence before him, he did not have the benefit of a specific analysis of plaintiff's mental functional limitations, as provided by Dr. Renn (<u>see</u> Tr. 290-95). In addition, it does not appear that he had the benefit of a full mental status examination, as performed by Ms. Mould (Tr. 269-70). Although evidence in the record before the ALJ contained references to plaintiff's

depression being in partial remission and being quiescent (Tr. 202, 236), the record before the ALJ did not include this new evidence, which contains a more thorough assessment of plaintiff's mental impairment(s). Dr. Renn assessed various areas in which plaintiff suffered a moderate impairment, meaning a "limitation which seriously interferes with the individual's ability to perform the designated activity on a regular and sustained basis, i.e., 8 hours a day, 5 days a week, or an equivalent work schedule" (Tr. 293). Therefore, this evidence is related directly to plaintiff's limitations in his ability to function in the workplace and is material and relevant. In addition, the evidence evaluated before the ALJ does not appear to have included any evaluation that was focused specifically on plaintiff's mental impairments. Therefore, the Court cannot find that the ALJ's decision here was based on substantial evidence in the record without consideration of the mental health counselor's statements and the specific assessments of plaintiff's functional mental limitations by Dr. Renn. See Ramirez, supra, 8 F.3d at 1452.

It is not clear from Dr. Renn's statement if the functional limitations assessed were based on depression. The new evidence also includes an assessment from Ms. Mould that plaintiff suffered from an anxiety disorder (see Tr. 287). However, Ms. Mould is not an acceptable source and only an acceptable medical source "can provide evidence to establish an impairment." See 20 C.F.R. § 404.1513 (a). The ALJ may seek to develop the record regarding the functional assessments by plaintiff's psychiatrist, Dr. Renn, and determine whether or not they are based on plaintiff's depression or another medically determinable impairment. As it is the only specific assessment regarding

plaintiff's mental functional impairments, it should be considered. The new evidence also includes lay statements regarding plaintiff's functional limitations in the workplace, both of which should be considered following remand of this matter.

## CONCLUSION

The ALJ evaluated properly the medical evidence and plaintiff's credibility on the basis of the record before him. However, when the new evidence is considered that does not appear to have been considered by the ALJ, the Court cannot find that the ALJ's decision is based on substantial evidence in the record as a whole.

Based on these reasons, and the relevant record, the undersigned recommends that this matter be **REVERSED** and **REMANDED** to the administration for further consideration pursuant to sentence four of 42 U.S.C. § 405(g). **JUDGMENT** should be for **PLAINTIFF** and the case should be closed.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of de novo review by the district judge. See 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on January 27, 2012, as noted in the caption.

Dated this 3rd day of January, 2012.

J. Richard Creatura
United States Magistrate Judge